1   HEATHER E. WILLIAMS, Bar #122664
    Federal Defender
2   ERIC V. KERSTEN, Bar #226429
    Assistant Federal Defender
3   Designated Counsel for Service
    2300 Tulare Street, Suite 330
4   Fresno, CA  93721-2226
    Telephone: (559) 487-5561
5   Fax: (559) 487-5950

6   Attorneys for Defendant
    JOHN BAKER ROSE

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,            NO. 1:16-cr-00154 DAD

12             Plaintiff,                DEFENDANT'S SENTENCING
                                         MEMORANDUM; STATEMENT; LETTERS
13  vs.                                  OF REFERENCE

14  JOHN BAKER ROSE,
                                         Date:  October 10, 2018
15             Defendant.                Time:  10:00 a.m.
                                         Judge:  Hon. Dale A. Drozd

16

17         The Presentence Investigation Report (PSR) notes that absent the statutorily required 120

18  month minimum sentence Mr. Rose would face an advisory guideline range of 87 to 108 months.

19  Due to the mandatory minimum, the guideline term is 120 months.  The probation office

20  recommends that Mr. Rose be sentenced to a 120-month term of incarceration.  Pursuant to the

21  plea agreement, the government will also recommend that Mr. Rose receive a 120-month

22  sentence.  In accord with recommendations of the government and the United States Probation

23  Office, John Baker Rose (Jack) respectfully requests that the Court impose a 120-month term of

24  imprisonment.

25         Jack Rose is 77 years old and has no prior criminal history.  He suffers from a variety of

26  medical conditions including high blood pressure, high cholesterol and diabetes. He has suffered

27  one heart attack and had triple bypass surgery in 2007.  He has a family history of fatal strokes

28  and heart attacks, and both his parents and all siblings died prior to reaching age 77.  If the Court

1  imposes the recommended 120-month sentence, with credit for time and assuming he qualifies

2  for maximum good time, Mr. Rose will be 83 years old when released from the Bureau of

3  Prisons.  Mr. Rose requests that the court that the Court impose a 120-month term of

4  imprisonment followed by a 60-month term of supervised release as it will give Mr. Rose

5  something to look forward to should he live past 88.

6       Mr. Rose would like the Court to know that since his arrest he has lain awake many

7  nights pondering the blunders he made leading to the current criminal charges.  For a time he

8  tried to rationalize his behavior, find excuses for, and other people to blame for mistakes that

9  were his alone. But this search was futile. He has no excuses.

10       Mr. Rose is appalled by his behavior.  He is deeply sorry for his actions and for the pain

11  he has caused.  He offers his heartfelt apology to the victim and her family and hopes they may

12  find peace and strength in recovering from the damage he has caused.

13       While there is no excuse for Mr. Rose's behavior in this case, it is important to note that

14  he has led a productive, admirable life in other respects.  The following excerpts from letters

15  submitted on his behalf provide a fuller picture of who John Rose is.

16       The Reverend Peter A. Sulyok is pastor at Bridgehampton Presbyterian Church where

17  John Rose was baptized and confirmed, speaks highly of Mr. Rose.  Reverend Sulyok "had

18  frequent conversations with [John] concerning both the volunteer work he did for [the]

19  congregation as its web-master and candid conversations on [John's] faith during frequent

20  extended telephone calls."  Reverend Sulyok states:

> When I arrived here in 2011, the church had a somewhat archaic website and email system. John phoned from St. Paul to volunteer his assistance in redoing it for the church he loved, had participated in much of his life, and where he had sung regularly in the adult choir. With his guidance, we formed a Web Development Committee and met via conference call where John played a key role in modernizing our website and email system. Early on he suggested we broadcast the Sunday Service on the Internet. He then provided equipment to do so and ran it remotely each week
>
> from his home in St. Paul -- taking time to put the sermon and worship online with the Sunday worship bulletin.

1
2
3
4
5
6
7

>I wish I had more members as dedicated with their time and talents to serving the church as John was. I learned after his arrest that he managed also the website for his High School class year, keeping them connected as well as other groups in St. Paul, such as a local theater group. John wrestled healthily with his faith in our conversations and was grounded in helping those in need. Community service is part of his character. I appreciated his keen and thoughtful intellect and ready sense of humor and his positive outlook on life. When arrested, our congregation lost our broadcast services as well as eventually the whole website as I had been unaware that he completely covered its expense -- again as his service to the church

8   Rabbi Jan Uhrbach is a former attorney and law clerk to Judge Kimba M. Wood of the

9   Southern District of New York.  She is the current rabbi of the Conservative Synagogue of the

10   Hamptons, in Bridgehampton, NY.  Rabbi Uhrbach provides further insight into Mr. Rose's

11   character.  She states:

12
13
14
15
16
17

>Our community rents space for the High Holidays at the Bridgehampton Presbyterian Church, where Mr. Rose was a long-time (and for a time long-distance) member. The first year we were in residence there, on the afternoon before Rosh Hashanah I noticed a sign there referring to live-streaming. That year was the first time my parents were unable to travel from Florida to be with us for High Holiday services, because my mother was suffering from ALS. I asked Pastor Peter Sulyok about the livestreaming, and he told me that Mr. Rose handled that remotely from Minnesota, and that he would check with him about it.

18
19
20
21

>Within an hour, I received from Mr. Rose the most beautiful and sensitive e-mail, indicating that of course he would handle the livestreaming for us, as he did thereafter for a number of years until his arrest. Because of his kindness, at the last minute my parents were able to listen to our High Holiday services from their home, and a very sad time was made much more joyful. Little did I know then that both my parents would be gone within two years.

22
23
24
25
26
27

>Neither of them would have been able to have any kind of worship experience on their last Yom Kippur but for Mr. Rose. While this small act of kindness may not seem like much, it was the graciousness and sensitivity with which he did it that so impressed me. Without requests from me, he let me know that he would be sure to turn the system on before candlelighting, he wished me and my community a happy and healthy new year in Yiddish, and generally expressed his delight and pleasure that his beloved church was hosting a Jewish congregation. Through all the years of our correspondence, I always felt that he bent over backwards to help us in any way he possibly could.

28

>Perhaps most indicative of his extraordinary sense of responsibility and service, following his arrest, he managed from

1

2

3

prison to explain to a friend how to handle the livestreaming of our services. This enabled a beloved congregant of ours, who has since passed away, to listen to our Yom Kippur services with our daughter from the hospital where she was that day receiving chemotherapy for pancreatic cancer.

4

5

6

7

8

9

Although I have not had the opportunity to meet Mr. Rose personally, I am convinced from his actions and words that Mr. Rose is a genuinely pious person, committed to service to others, and possessed of an expansive and ecumenical spirit. He has of course pled guilty to a very serious crime, for which he has already paid dearly. It is my sense that he is genuinely remorseful for having acted on a terrible impulse. I believe that he is fundamentally a decent, kind and good person, and it is my prayer that a lenient sentence may enable him to atone for his wrongdoing by continuing to do good in the world, rather than through a lengthy prison term.

10    Jeannie Perry, a friend of Mr. Rose for many years, provides insight into his private life.

11    She states:

12

13

14

15

I have been friends with John Rose (Jack) for a number of years; we met through our interest in music and community theatre, and have performed a few times together -- he is a skilled piano player. He has been a good friend and has been very generous with me, such as paying for veterinary bills I couldn't afford, helping me with car repair bills, taking me out to nice dinners and plays, often

16

17

18

19

20

including my friends as well. I am a senior citizen on Social Security, so he has helped me out financially a number of times. He is a pet lover, and has also stayed at my house and taken care of my animals several times while I was away; I trusted him completely with my home and my pets. (I adopted his cat when he was arrested.) He has also provided me with a good computer and its upkeep, as he was an expert in the computer field. He was a founding member of a prestigious group of computer consultants in Minnesota.

21

22

23

24

25

He has been active in music, was a member of the Musician's Union, and was also active in community theatre for many years, was on the board of directors of the Lex-Ham Players in St. Paul MN, and has been very helpful to that group, in addition to performing in some of their plays and musicals. In the past he has been a radio disc jockey and announcer, recorded books for the blind, and recorded some radio announcements/commercials, some of them gratis. He also has been very helpful to his former church in Long Island, including arranging to have their services live-broadcast to home-bound members. He holds a degree from Brown University and served honorably in the U.S. Air Force.

26    //

27    //

28    //

1    Jack also remains on good terms with his ex-wife, Anne Kolbe.  She and Jack were

2    married in 1979, separated in 1998 and were divorced in 2003.  Ms. Kolbe states:

3    
> In 1977, I was diagnosed with bipolar disorder. Jack took care of
4    
> me during psychotic episodes, some of which led to
> hospitalizations. While we were separated, he sold some property
> and generously shared the proceeds with me, at great disadvantage
5    
> to himself. Though Jack moved on with his life, he always found
> time to talk to me, with words of encouragement and/or advice.
6    
> When my computer failed, Jacked had a new one sent to him, put
> all the software on it, and drove it from Minnesota to New York
7    
> and installed it for me. … I know that, when released, he will do
> nothing to cause a return to incarceration.

8    

9    Lynn Rose, the wife of Mr. Rose's deceased brother, Charles, states:

10   
> Through 32 years of interaction I have found [Jack Rose] to be a
> caring and generous person. His home and his resources he uses to
11   
> help those around him. We have benefitted from his kindness on
> several occasions. … He has provided a web presence for his
12   
> church, is or was involved in local theater and in general has been
> a champion of the rights of underdogs both 2 and 4 footed, for
13   
> years. The John I know can be impulsive, annoying, wonderful,
> and sometimes dumb (although very intelligent) but never
14   
> intentionally hurtful or deceitful.

15   The Rev. Kristin Anderson knows Mr. Rose through their collaboration on her stage play,

16   which they performed together in 2013.  Ms. Anderson's lead had to abandon the role at the last

17   minute and Jack happily stepped in.  The Rev. Anderson states:

18   
> [Jack] was eager to perform, meeting every expectation I had for
> practicing in the extremely short time we had before the first
19   
> performance. Beyond that he offered invaluable help by bringing
> along someone who could incorporate music into the show and
20   
> manage the sound system. He designed a workable way for us to
> read the script and was generous with advice and sharing the ways
21   
> of the theater. He was prompt, consistent and capable. The show
> was a success because of him. All this was done with his
22   
> understanding there would be no pay for his involvement.  We
> shared a small dressing room with a curtained off area; he was
23   
> respectful of me and my space and invariably courteous.

24   John Rose is deeply sorry for his actions and for the pain he has caused.  He apologizes to

25   the victim and her family.  He hopes he survives his term of imprisonment, as he is eager to

26   reenter the law-abiding world to resume being productive, earning money, paying taxes, and

27   committing hours per week to public-spirited projects.

28   //

Rose:  Sentencing Memorandum                                                    -5-

1    **Mr. Rose Objects to Imposition of the $5,000 JVTA Assessment**

2        18 U.S.C. § 3013(a) provides: "The court shall assess on *any* person convicted of an

3    offense against the Unites States" a $100 special assessment provided the offense is a felony.

4    18 U.S.C. § 3013(a)(2)(A) (emphasis added).  In contrast, 18 U.S.C. § 3014(a), the Justice for

5    Victims of Trafficking Act of 2015 (JVTA), provides that "in addition to the [$100 special

6    assessment imposed under section 18 U.S.C. § 3013(a)(2)(A)], the court shall assess an amount

7    of $5,000 on any *non-indigent* person or entity convicted of an offense under ... chapter 117 [18

8    USCS §§ 2421 et seq.]."  18 U.S.C. § 3014(a)(4) (emphasis added).  Thus, while the $100

9    special assessment under section 3013(a) is mandatory and "shall [be assessed] on *any* person

10   convicted of an offense against the Unites States;" the $5,000 JVTA assessment applies only to

11   "*non-indigent*" persons or entities.

12        Mr. Rose agrees he would be subject to the $5,000 JVTA assessment provided he were

13   "non-indigent."  But clearly, Mr. Rose is indigent.  As stated in the PSR, Mr. Rose is 77 years

14   old, he is facing an extended term of incarceration, he has no income, he has no assets, and his

15   net worth is *negative* $35,360.  Mr. Rose objects to imposition of the $5,000 JVTA special

16   assessment on this basis that he is indigent.

17   //

18   //

19   //

Rose:  Sentencing Memorandum                          -6-

1

**CONCLUSION**

2      The victim has requested $500,000 in restitution for the loss of her virginity, but this is a

3   non-monetary loss not subject to restitution.  In accord with the PSR recommendation, Mr. Rose

4   requests that no restitution be ordered.

5      Based on the foregoing, defendant John Bake Rose respectfully requests that the Court

6   impose a sentence including a 120-month term of incarceration followed by a 60-month term of

7   supervised release.

8      DATED: October 4, 2018

9                                          Respectfully submitted,

10                                         HEATHER E. WILLIAMS
                                           Federal Defender
11

12
                                           /s/ *Eric V. Kersten*
13                                         ERIC V. KERSTEN
                                           Assistant Federal Defender
14                                         Attorney for Defendant
                                           JOHN BAKER ROSE
15

16

17

18

19

20

21

22

23

24

25

26

27

28